## THE CADARETTA.

### No. 7516.

District Court, W. D. Washington.
April 30, 1947.

Levinson & Friedman, of Seattle, Wash. (Edwin J. Friedman, of Seattle, Wash., of counsel), for libellant.

Bogle, Bogle & Gates, of Seattle, Wash. (Thomas L. Morrow, of Seattle, Wash., of counsel), for claimant and respondent.

LEAVY, District Judge.

This case has been rather extended beyond what the Court thought it would be when we entered upon the trial in the beginning. The issues are not nearly so complicated as is the evidence that has been submitted in support of the contentions of the respective parties. If I felt that I would be assisted in making a disposition of it by arguments either brief or extended, I would ask for them, but I think I have a fairly clear picture of the situation involved here. This is an Admiralty proceeding. It is to be tried by the extremely liberal rules of Admiralty making it a trial on the equity side of the Court although not even bound by equity rules. It is in the nature of a law action for damages growing out of a breach of contract. I say it is of that nature, but in the final analysis it is a suit in Admiralty, and Admiralty law exists with a view to protecting the men who engage in this hazardous calling of the sea, and at the same time it should never be applied in a manner that will work an injustice to the ship owner or the ship.

By reason of the fact that we were engaged in the World War, and the various war powers that were conferred upon the President as Commander-in-Chief of the Army were brought into play, the matter

of pecuniary profits in the shipping industry became secondary. The government virtually commandeered the entire shipping industry in one form or other. The regulations were of such a nature that they would tend to insure the greatest possible expedition in the movement of cargoes, of men and of other material that had to do with the successful prosecution of the war. The particular ship involved here, the S. S. Cadaretta, was not carrying war supplies directly, nevertheless it was carrying a cargo from San Pedro to Tacoma of salt which went into a manufacturing process and ultimately, in large measure, became some type of war material.

The various unions that represented the seamen in whatever capacity they served had made a pledge that there would be no strike, and yet like all people are when an opportunity comes to drive a good bargain, they drove it, within limits of the regulations.

In this case there is no dispute that the ship, S. S. Cadaretta, was at Everett, undergoing temporary repairs due to difficulty she had experienced before she arrived at Tacoma and discharged her cargo. Under normal conditions she would have undergone complete repairs either at Tacoma, Seattle or Everett. But, under war conditions, it was clear that her permanent repairs would have to be done even in a foreign country, in Vancouver, B. C. Her owners were confronted on the 9th or 10th of June, in 1945, with the matter of moving her for such permanent repairs, and they had no crew—at least not a sufficient crew, so, under the practices that have grown up, they didn't go out on the waterfront or the highways and byways to seek men to constitute a sufficient crew to move her the short distance between Everett and Vancouver, but following the practice that had grown up and a legal obligation out of contract relationship between the representatives of the seamen and representatives of the shippers, they applied to the Unions for a sufficient crew to move this ship, and fixed a definite time. The testimony is that the place where these men were recruited was their union hall. I think they followed a practice that is common in their activities when they quit a ship or were paid off if they hadn't had a foreign voyage, they turned in their tickets and then they were placed on the list of eligibles again for the next job out. They were given an opportunity by, if we can use the term, seniority of the turning in of the tickets as to whether they would go out or not, which they could accept or reject. If they accepted, then, of course, when they came back again from such service, they went through the same process, only they were at the bottom of the list.

A short service of 24 hours or 48 hours of necessity called for a sacrifice in money unless it was compensated for in payment because there would be the possibility or the probability of being put down at the bottom of the list and not going out as quickly as they otherwise would.

It seems that a custom has grown up in maritime work that, when a situation arises in the shipping industry such as the one in question here, that employment is on a "run-money" basis. I am using the expression as it has been used throughout the trial. The owners of this vessel and their representatives, knowing that this would be a short service, proceeded in getting a crew that would move this vessel from Everett to Vancouver, and in the negotiations, it is quite clear to the Court that the representatives of the union did not overlook any advantages they had under the emergency conditions that existed. This vessel was badly needed in service and every hour's delay was minimizing, in the long run, the effectiveness of our war effort even at that time.

The representatives of the Union recognizing the fact that the men that they sent in response to the request would be making a substantial sacrifice in connection with immediate future employment, and, on the other hand, recognizing the needs of the shipper, made a demand for a fixed fee for this service per man for the first 48 hours and beyond that a fixed hourly pay for overtime, drafted this contract from a form they had, the contract being in evidence in this matter as Libelant's Exhibit 1, yet I am prepared to state, did it reluctantly, and did it because of the emergency that

existed and confronted them, and doubtless, after due consideration, realized that it would be to their advantage to pay what appeared to be a rather large wage for the service. The ship owners, so far as their meeting with the Union representatives was concerned, were perfectly willing. Everybody concerned believed that to enter into the contract this ship would be moved within 24 hours or less.

The Union representatives suggested, due to its disabled condition and all the other contingencies of weather that might arise, that it might be 48 hours, so the contract was drawn on a 48-hour basis, and knowing the uncertainties of the sea, they made a provision to meet a contingency that nobody ever expected would arise, that is, pay $1.58 an hour for a period beyond 48 hours.

The contract was freely and willingly and openly entered into. Now, after it was signed on the morning of the 13th of June, someone interested in the shipper's side conceived the idea that the rates here were running afoul of the rates fixed by the War Labor Board, and the agent, who was the Olympic Steamship Company, after consultation with others representing the shipping interest, rather than the employee interests, sent this wire in question on the morning of June 14th, which was before the ship's sailing time. That had been set for three o'clock in the afternoon. The wire was sent to the War Shipping panel, and five days elapsed before a reply was had. The ship could have been taken to Vancouver five times over before the War Shipping panel, so far as this record is concerned, took any official action, which was in the form of a telegram on June 19th, and in this record as A-7. And that was followed by a communication in the form of a letter on the 19th, which was evidently dictated and put in the mails on June 19th. I assume it was mailed the day it was dated.

This letter was a formal order then, and it went to all of the Unions involved as well as to the ship owners. The telegram though was undoubtedly received on the 19th or 20th and action followed reasonably rapidly thereafter before the formal order actually was received by the parties who were interested. These men were told that their services were not longer needed; and under the War Labor Board Order they could not proceed on the contract that they had made.

Now, in this last situation, I am satisfied the owners and interested parties of the S. S. Cadaretta acted in good faith believing that they must now abide by the War Labor Board Order, otherwise they might be subjected to the penalties. I am not called upon, in a determination of this case, to say whether the War Labor Board acted within or without their jurisdiction. It is certain that, under the regulations, drastic and far-reaching as they were, they would not ordinarily be called upon to render a judgment. This order was both hasty and summary and without having all the parties before them. The regulations make some provisions indicating notice must be given. I am not going to attempt to analyze them. The parties to this suit had nothing but a telegram upon which to act in the first instance. After the ship operators received the telegram they did communicate with the national heads of these maritime unions, but not with the local representatives who signed the contract. The local representatives indicated that four or five days after June 14th, they heard there was something in the way of difficulty involving the War Labor Board. But that's far from anything that even smacks of a fair consideration and I think the Court is safe, at least, in stating and passing upon this, that the War Labor Board panel, whoever they were, could not possibly have had from the meager information furnished them, a real picture of what the situation was out here, because the position that they finally took resulted in long delay, resulted in a financial loss to the ship owners and a loss to the government, and a delay in the execution of the war effort.

I have said what I have for the purpose of meeting the defense, that the owners of this ship should be relieved from the responsibilities they assumed under the contract. I realize that they were assumed out of an existing emergency, but there's nothing in the situation that warrants the

Court in granting relief upon that basis, because the order of the War Labor Board formally made and mailed out in letter form to the national representatives of the Unions here involved was at a date when the men were no longer on the ship, but it wouldn't make any difference in my conclusions if it arrived at any earlier date than June 25th. The seamen were all off the ship by June 23rd.

■ The claimant here is in error in his conclusion that he had entered into a contract, a run-money contract, that would subject him to penal liabilities. I am satisfied there is no court in the land that would assess a penalty under a set of facts such as we have here, because they indicate the best of faith to begin with on the part of everyone and while the powers were extensive that Congress conferred upon the President and the regulations were far reaching that he made to enforce them, still they had not departed from those fundamental principles that involve criminal charges to such a degree that would warrant any criminal penalty.

■ The men themselves, the sailors, the deck hands and all of the men involved here put in their time, excepting the two licensed men. The latter, the evidence indicates and I shall find, put in the first 48 hours and they were ready for call the rest of the time, but they weren't in Everett during that time and I would not consider them entitled to any compensation beyond the first 48 hours. The evidence is quite persuasive that the other men were on hand ready to go at any hour on the shortest notice up until June 23rd. The decision, it seems to me, as to what reward should be given these men and what charge should be taxed to the ship, is that which would be most equitable under the unusual situation. I have no difficulty at all in finding that the wage after 48 hours at $1.58 an hour around the clock would be an unrea-

sonable and an unconscionable amount, and I would not allow that.

■ I do feel that, from all of the factors in this case, the libelants, all of them, were entitled to their "run money," $75 to the unlicensed personnel and whatever the sum was to the licensed personnel. After 48 hours it was quite evident that this ship was not going to sail for some time and the evidence is sufficient to support a logical inference that the representatives of these seamen who had negotiated the contract knew soon after June 16th, which would be the period beyond the 48 hours, that there were some difficulties involving the issue of wages. The men were all at liberty to quit if they saw fit and likewise the steamship company, the respondent, was at liberty to discharge them.

Neither took advantage of their rights in that regard until the 23rd day of June, when the respondent did by discharging the entire crew.

I feel that from the period after the 48 hours to the date when the crew were released by being tendered the sum that the respondent contended was due them, they should be paid upon the basis of not $1.58 an hour either around the clock nor for 8 hours a day, but the basis of compensation that would be awarded to them had they been sailing on a voyage on this ship. That becomes a matter of calculation, and if there is a conflict between the time as calculated by the individual who testified last here that kept the records for the company and the seaman who kept the records for his crew, I am going to adopt the time as fixed by the ship itself and make payment upon that. That is all in this record. I am not going to attempt to state what it is and I have not made a computation. There may not be any conflict whatever. You may prepare findings and a decree awarding to the libelants the sums that I have indicated less such sums as have been paid to them.